IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. No. CR-12-278-D |
| | ) | |
| LASHANTE LAMAR CARTER and | ) | |
| BARUNDI NACHELLE LOLLES, | ) | |
| | ) | |
| Defendant. | ) | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW,
AND ORDER**

This matter comes before the Court upon Defendants' Motion to Suppress Evidence

Obtained as a Result of an Illegal Arrest, Search and Seizure [Doc. No. 26], filed pursuant to Fed.

R. Crim. P. 12(b)(3)(C) by Defendant Barundi Nachelle Lolles and joined by Defendant Lashante

Lamar Carter.  The government timely opposed the Motion.  On January 23, 2013, the Court held

an evidentiary hearing at which Defendants appeared personally and through their appointed

counsel, Assistant Federal Public Defender William P. Earley for Ms. Lolles and John W. Coyle,

IV for Mr. Carter.  The government appeared through Assistant United States Attorney Travis

Smith.  The Court heard the testimony of two officers of the Oklahoma City Police Department

(OCPD):  Detective Timothy Hock; and Sergeant Wesley Cadena.  Defendants' counsel presented

oral arguments, and the government adopted its written brief, with minor corrections announced at

the commencement of the hearing.  Upon consideration of the evidence, the case record, and the

parties' arguments, the Court finds and rules as follows.

**Findings of Fact**

The Indictment charges in Count 1 that on or about July 15, 2012, Mr. Carter knowingly

possessed two firearms after a felony conviction, in violation of 18 U.S.C. § 922(g)(1), and in

Count 2 that Ms Lolles aided and abetted such possession, in violation of 18 U.S.C. § 2.  Defendants move to suppress physical evidence on which the government will rely to prove these charges.  The firearms, two semi-automatic pistols, were seized from the trunk of a vehicle in which Defendants were traveling on the date charged, when they were stopped and detained by Sgt. Cadena and his partner, based on information supplied by Det. Hock or another detective with whom they were working on that date.  The officers testified at the hearing concerning the events leading up to their contact with Defendants.  Their testimony established the following facts pertinent to the Motion, as found by the Court.

Det. Hock is a 25-year veteran of OCPD, having spent the past 19 years with its gang unit, including nine years as a detective for gang-related violent crimes.  In that capacity, he is aware that members of the Neighborhood Crips gang favor a college sports team having the same initials, North Carolina, and often wear clothing that bears the interlocking "NC" logo and light-blue colors of that school.  He is also aware that local gangs are commonly involved in criminal activities involving illegal drugs and guns.

OCPD learned through intelligence that gang members had been buying firearms at local gun shows, which are held regularly at the Oklahoma City Fairgrounds, and that older members had provided training about how legally prohibited persons could make such purchases.  These techniques generally involve patronizing "private collection" tables, which are not operated by licensed vendors and require no federal paperwork, and enlisting female nonprohibited persons to assist in making the purchases.  Based on this intelligence, OCPD has been "working" gun shows for approximately 18 months (as of July, 2012, less than 12 months), and has made 40-50 arrests through this effort.

2

On July 15, 2012, Det. Hock and others were assigned to work an overtime program for a gun show at the fairgrounds.  The unit on duty consisted of six to eight agents in plain clothes located inside the exhibit hall, including Det. Hock, and additional uniformed officers on patrol outside.  Det. Hock's attention was first drawn to Defendants because they approached a group that included an individual known to be a prohibited person associated with a gang.  Mr. Carter greeted this individual in a friendly manner and visited with him a few minutes; Ms. Lolles spoke but primarily listened to the conversation.  Det. Hock also noticed that Mr. Carter was wearing a North Carolina shirt, and both defendants were wearing blue colors that he associated with North Carolina and Neighborhood Crips.

Det. Hock then observed Defendants' behavior at the show for the next 30-40 minutes. During that time, Det. Hock heard Mr. Carter ask a vendor about the availability of an uncommon assault-style pistol (a "PLR16"), heard him ask a vendor at a table whether paperwork was required, and watched him leave the table after the vendor said, "yes," that paperwork would be required for purchase of a gun.  Defendants eventually returned to a private-vendor table they had visited earlier, and purchased a Taurus pistol; Mr. Carter used cash from his pocket and additional cash from Ms. Lolles.  Immediately after making the purchase, Mr. Carter handed the weapon to Ms. Lolles, who put it in her handbag.  Defendants then proceeded to a second private-vendor table they had visited and repeated the procedure, with Ms. Lolles providing all the cash for this transaction and, again, receiving the pistol from Mr. Carter and putting it in her large purse.  Each of the guns was boxed in a factory case about 12-14 inches long and 6 inches wide.  Det. Hock testified it was unusual to see the female member of a couple at a gun show carrying purchased guns.

Within minutes after the second purchase, Defendants exited the gun show and walked to a black Mercedes car in the parking lot.  Det. Hock watched Defendants place the guns in the trunk

of the vehicle, enter the car, and drive away with Mr. Carter behind the wheel.  Det. Hock or his partner radioed OCPD patrol officers a description of the car and requested a stop.  The patrol officers were part of the gun-show program.  It was part of the operating plan to allow patrons who were suspected of possible violations to leave the gun show, and to stop them afterward.

Sgt. Cadena and another OCPD sergeant were in the patrol car that stopped Defendants' vehicle.  They were patrolling on the north side of the fairgrounds when the call was received, but made contact south of the fairgrounds within five minutes.  They located the Mercedes westbound on Reno Avenue approaching Portland Avenue.  Another patrol car was initially closer, but became delayed by road construction.  In addition to a description of the vehicle, the patrol officers were informed there were two individuals in the Mercedes, they were possibly involved with illegal gun purchases, and the firearms were last seen in the trunk.

Mr. Carter pulled into a convenience store parking lot, and the uniformed officers exited their patrol car.  Sgt. Cadena approached the Mercedes on the driver's side and asked Mr. Carter for his license and vehicle registration.   Mr. Carter stated he did not have a driver's license.  Sgt. Cadena instructed Mr. Carter to step out of the vehicle, and escorted him to the patrol car.  This was standard procedure for a traffic stop involving a driver without a license.  Sgt. Cadena handcuffed Mr. Carter, and seated him in the back seat of the patrol car.  Sgt. Cadena ran a check for outstanding warrants and driver's license status, and learned that Mr. Carter had neither.  At the same time, Sgt. Cadena also checked Mr. Carter's criminal history using the Department of Corrections offender database, and found that Mr. Carter had felony convictions.  Sgt. Cadena received this information within about five minutes of detaining Mr. Carter.

In the meantime, other officers arrived at the scene of the traffic stop, including Det. Hock and a second patrol car.  Sgt. Cadena informed Det. Hock of Mr. Carter's felon status, and Det. Hock

4

informed Sgt. Cadena of additional details of the gun purchases.  Sgt. Cadena's partner instructed Ms. Lolles to exit the Mercedes, and she was placed in the second patrol car.  A back-up unit is standard procedure when a stop may involve firearms.  The officers searched the trunk of the Mercedes and found two pistols in boxes, a .357 caliber Glock and a .45 caliber Taurus.  Defendants were arrested.

## Conclusions of Law

The government bears the burden of proof regarding the validity of a warrantless seizure. *See Florida v. Royer*, 460 U.S. 491, 500 (1983); *United States v. Herrera*, 444 F.3d 1238, 1242 (10th Cir. 2006).  In this case, the government contends Defendants' initial seizure was an investigative detention, or *Terry* stop, permitted under *Terry v. Ohio*, 392 U.S. 1 (1968).  To determine whether such a detention was constitutionally permitted, courts ask both "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id*. at 20.  "A law enforcement officer may stop and briefly detain a person for investigative purposes 'if the officer has a reasonable suspicion . . . that criminal activity may be afoot.'" *United States v. Soto-Cervantes,* 138 F.3d 1319, 1322 (10th Cir. 1998) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).  A traffic stop may be initiated for an investigative purpose if this standard is met; "the lawfulness of such a stop is not limited to situations where an officer suspects a traffic or equipment violation." *See United States v. Whitley*, 680 F.3d 1227, 1232 (10th Cir. 2012).

"An investigatory detention is justified at its inception if the specific and articulable facts and rational inferences drawn from those facts give rise to a reasonable suspicion a person has or is committing a crime." *United States v. McHugh*, 639 F.3d 1250, 1255 (10th Cir.), *cert. denied*, 132 S. Ct. 278 (2011) (internal quotations omitted).  "Whether an investigative detention is

5

supported by an objectively reasonable suspicion of illegal activity does not depend on any one factor but on the totality of the circumstances." *Soto-Cervantes,* 138 F.3d at 1322 (internal quotation omitted); *see also United States v. Conner*, 699 F.3d 1225, 1228 (10th Cir. 2012); *McHugh*, 639 F.3d at 1256.  The Supreme Court has emphasized that reviewing courts must look at the totality of circumstances "to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing.   This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotations and citations omitted).  Further, a determination that reasonable suspicion exists "need not rule out the possibility of innocent conduct." *Id*. at 277; *Conner*, 699 F.3d at 1228.  "Reasonable suspicion requires only 'some minimal level of objective justification.'" *Conner*, 699 F.3d at 1228 (quoting *Sokolow*, 490 U.S. at 7).

In this case, the Court easily concludes that the police officers' investigative detention of Defendants was supported by reasonable suspicion of criminal activity, based on specific and articulable facts.  These facts included Mr. Carter's familiarity with an individual whom detectives believed to be a prohibited person affiliated with a gang, and Mr. Carter's clothing and the colors thereof, but more importantly, the officers' observations of Defendants' behavior at the gun show over a period of 30-40 minutes and Defendants' purchases of the two pistols.  Det. Hock's testimony's was fully credible that the officers believed the manner in which Defendants approached vendors suggested they were trying to avoid federal paperwork requirements, and that the manner in which the transactions were conducted suggested that Mr. Carter wanted to select and purchase the weapons but not to carry them.  The totality of circumstances suggested to officers that Mr. Carter was legally prohibited from possessing firearms and Ms. Lolles was helping him purchase

them.  Because Det. Hock and the officers at the gun show who observed Defendants' conduct had

reasonable suspicion of criminal activity, this "collective knowledge" was imputed to the patrol

officers who acted on their request to make a traffic stop.  *See Whitley*, 680 F. 3d at 1234-35; *see

also United States v. Chavez*, 534 F. 3d 1338, 1345-46 (10th Cir. 2008).[1]

Further, when making the investigative stop, the patrol officers were entitled to utilize

precautionary measures to ensure officer safety.  *See United States v. Copening*, 506 F.3d 1241,

1248 (10th Cir. 2007).[2]  Here, although the guns were reportedly located in the trunk rather than the

passenger compartment, the OCPD officers did not maintain visual contact with Defendants after

they left the fairgrounds area.  Sgt. Cadena testified credibly that his initial information was that the

guns were "last seen" being placed in the trunk, and that  Defendants were out of sight during at

least part of the time that patrol officers were attempting to locate the described vehicle.  Thus, the

officers making the traffic stop did not know whether the guns that had been placed in the trunk of

the Mercedes still remained there.

The Court also easily concludes that the duration and scope of the patrol officers *Terry* stop

of Defendants was reasonably related to the purpose for the investigatory detention.  Although the

officers did not witness a traffic violation, Sgt. Cadena was immediately informed that Mr. Carter

was driving without a license.  Thus, Sgt. Cadena was justified in removing Mr. Carter from the car

---

[1]  "Under the vertical collective knowledge doctrine, an arrest or stop is justified when an officer having probable cause or reasonable suspicion instructs another officer to act, even without communicating all of the information necessary to justify the action."  *Whitley*, 680 F.3d at 1234.

[2]  "Because police officers need not take unnecessary risks in the line of duty, they may take precautionary measures that are reasonably necessary to safeguard their personal safety, and to maintain the status quo, during a *Terry* stop."  *Id.* (internal quotation omitted).

and detaining him while Sgt. Cadena made a computer verification and determination of his driver's license status. *See United States v. Karam*, 496 F.3d 1157, 1161 (10th Cir. 2007). Within the time it took to make that determination, Sgt. Cadena also learned Mr. Carter had a criminal record that included felony convictions. At roughly the same time that Sgt. Cadena gathered this information, Det. Hock arrived at the scene. Again, the "collective knowledge" doctrine permits the two officers to pool their information in order to establish probable cause that Mr. Carter was a felon in possession of firearms. *See Chavez*, 534 F.3d at 1345.[3] Combining Sgt. Cadena's knowledge of Mr. Carter's felony convictions with Det. Hock's observation of the gun purchases, the officers clearly had probable cause to arrest Mr. Carter for unlawful possession of firearms and Ms. Lolles for aiding and abetting his possession.

Further, the officers' search of the Mercedes was permissible under the "automobile exception" to the warrant requirement, which "permits law enforcement officers who have 'probable cause to believe a car contains contraband [to] search the car without first obtaining a search warrant.'" *Chavez*, 534 F.3d at 1338 (quoting *United States v. Beckstead*, 500 F.3d 1154, 1165 (10th Cir. 2007)). "Once the officer's suspicions rise to the level of probable cause, they are empowered to search 'the entire vehicle, including the trunk . . . .'" *Id.* (quoting *United States v. Bradford*, 423 F.3d 1149, 1160 (10th Cir. 2005)). "'Probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence.'" *United States v. Benard*, 680 F.3d 1206, 1210 (10th Cir. 2012) (quoting *Chavez*, 534

---

[3] "The [horizontal] category subsumes situations where a number of individual law enforcement officers have pieces of the probable cause puzzle, but no single officer possesses information sufficient for probable cause. In such situations, the court must consider whether the individual officers have communicated the information they possess individually, thereby pooling their collective knowledge to meet the probable cause threshold." *Id.* (citation omitted).

F.3d at 1344).  In this case, the arresting officers were informed by Det. Hock that he had witnessed Defendants place two guns they had purchased at the gun show in the trunk of the Mercedes.  Thus, in light of the additional information that Mr. Cadena has prior felony convictions, the officers clearly had probable cause to believe the car contained evidence of a crime, and the search for and seizure of the guns in the trunk were justified.

For these reasons, the Court finds that the investigatory detention of Defendants by OCPD patrol officers was justified, that their detention was reasonably related to the circumstances that justified it, that the officers had probable cause to arrest Defendants, and that the search of Defendants' vehicle to recover firearms seen by the agents at the gun show was permissible. Therefore, the Court finds no Fourth Amendment violation occurred, and no unconstitutional conduct caused the pistols to be seized.

## Order

IT IS THEREFORE ORDERED that Defendants' Motion to Suppress Evidence Obtained as a Result of an Illegal Arrest, Search and Seizure [Doc. No. 26] is DENIED.

IT IS SO ORDERED this 30th day of January, 2013.

_____
TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE